**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3137-23

SHED WORLD,

    Plaintiff-Appellant,

v.

JIM FUNICELLI,

    Defendant-Respondent.

_____

Submitted June 3, 2025 – Decided August 8, 2025

Before Judges Susswein and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. DC-004906-23.

Michael B. Cooke, attorney for appellant.

Respondent has not filed a brief.

PER CURIAM

This case arises from a dispute concerning a contract for the delivery of a prefabricated shed. The contract price was $10,662.50. Defendant James Funicelli paid $2,000 to plaintiff Shed World when he placed the order, leaving

a balance of $8,662.50. Defendant determined after the shed was delivered that it did not include customized features as per the contract. Plaintiff filed suit to recover the outstanding balance.

Following a bench trial, plaintiff appeals the April 29, 2024 Special Civil Part order denying its claim for breach of contract and granting defendants counterclaim for breach of contract. The trial court allowed defendant to keep the shed without requiring him to pay the balance due reduced by the amount defendant paid to a contractor to fix the shed. After reviewing the record in light of the parties' arguments and governing legal principles, we affirm the trial court's denial of plaintiff's breach of contract claim against defendant and its finding that plaintiff breached the contract. However, we remand for the trial court to make more detailed findings on why defendant should not be required to pay at least a portion of the balance due, accounting for the amount defendant paid to a third-party contractor to fix the shed and such other equitable considerations the trial court deems relevant in determining damages.

I.

We discern the following pertinent facts and procedural history from the record. On July 16, 2022, the parties entered into a written contract for the sale of a shed. Per the contract terms, plaintiff agreed to deliver a shed with

customized features, including an interior partition wall, a countertop cutout, and bifold doors.  Defendant agreed to pay $10,662.50, with a $2,000 deposit. The contract did not include terms regarding delivery dates.

Plaintiff delivered the shed on September 6, 2022 and thereafter emailed defendant that "[y]ou still have an outstanding balance on our shed of $8[,]662.50 . . . .  As of Saturday, October 1, 2022 if the balance is not paid in full we will consider this a theft and we will take all the appropriate actions against you."

On October 3, 2022, defendant replied to the email, refusing to pay the remaining balance because:

> 1) The entry door to the "front" area of the shed was supposed to be right up to the partition wall - it is not - it is centered.  The side wall will have to be reworked to move the door.
>
> 2) The [four] service doors on the front of the shed are too large and heavy to be functional (made incorrectly) - the panels should be half the size that they are.  The hardware is not adequate.
>
> 3) The [four] service doors, when open on the entry side, block access to the entry door.  Extremely poor design with no thought given as to functionality/usability.
>
> 4) This front opening was also to be prepped and braced for a stone bar top/counter to be installed - it is not prepped in any way, the doors are flush and would have

3

to be cut to accommodate any counter at all, and there is no bracing of any kind. The entire wall will have to be reworked as well as the doors.

5) Although a relatively minor issue, the service door color is incorrect.

Defendant proposed to either: deduct the repair costs from the balance owed and pay the remainder to plaintiff "immediately," allow plaintiff to make the modifications, or plaintiff could return defendant's security deposit and take the shed back. At trial, defendant testified that it cost $4,105 to correct the shed to include the customized features.

In May 2023, plaintiff filed a complaint against defendant alleging breach of contract. Defendant's answer included breach of contract and fraud counterclaims.

The court held a bench trial on January 30 and February 20, 2024. Shed World's owner and defendant testified.

Defendant testified that plaintiff decided to deliver the shed when it was "raining cats and dogs." Despite his assertion to plaintiff that he did not want it delivered during the storm, defendant testified that plaintiff stated that "it doesn't matter . . . we'll deliver it, anyway, in the rain." Defendant testified that he was not able to notice the problems with the shed until after the rain stopped, stating:

When I tell you it was . . . raining cats and dogs, it was just a torrential downpour.  I was using an umbrella and getting wet with an umbrella.  The [delivery] guy was a really nice guy . . . .  He said, sign this [delivery certificate], I signed this, and I ran back in the house. . . .  I didn't even look at the shed that day or the day after, because it was still raining.  When we finally went to look we realized there were problems with opening the door, and then realized there was no cut-out for the counter done at all.

Based on the parties' testimony, the trial court issued an oral opinion followed by a two-page written order.  The court found that plaintiff's witness was untruthful, "inconsistent[,] and contradictory."  In contrast, the court found defendant credible, stating:

I found that he had the ability to know what he was talking about.  I found his testimony to be reasonable.  I found his demeanor on the stand to be good.  I found him to be truthful, not evasive.  I found him to be willing to answer questions.  I found his testimony to be believable.  And for the most part, I didn't find his testimony to be inconsistent or contradictory.

The court found that defendant discovered several issues with the shed after he gave it a thorough inspection two days after the rain stopped.  The court examined the written contract, which includes customized features for a "counter cut out [and] frame" and "bifold doors."  The court assessed whether the customizations were made, concluding "[t]here weren't bifold doors.  There . . . wasn't the support for the countertop, bracing."

5

The court addressed other deficiencies claimed by defendant, finding:

> Number one, the entry door to the front area of the shed was supposed to be right up to the partition wall and it's not. It is centered. The sidewall may have to be reworked to move the door. Now, the [c]ourt's review indicates that this is one of those rare instances where I disagree with . . . defendant. The diagram in P-1A clearly indicates that the door is to be centered. So the [c]ourt finds that he's wrong with respect to that.
>
> However, [defendant is] right with respect to the rest. The four service doors on the front of the shed are too large and heavy to be functional, made incorrectly. The panels should be half the size they are. The hardware is not accurate. The [c]ourt agrees with that for the reasons that we'll get into.
>
> Number [three], the four service doors when opened on the entry side block access to the entry door. Extremely poor design with no thought given as to functionality and usability. The [c]ourt agrees with that. Number [four], the front opening was also to be prepped and braced for a stone bar top to be installed and it was not. And . . . plaintiff testified that she didn't recall responding to those issues.

Based on these factual and credibility findings, the trial court denied plaintiff's claims, granted defendant's breach of contract counterclaim, and deemed that defendant would keep the shed on his property.

This appeal followed. Plaintiff contends the trial court erred in considering parol evidence outside the four corners of the contract; failed to use the appropriate "gap filler" from the Uniform Commercial Code (UCC),

6

N.J.S.A. 12A:1-101 to 12A:12-26, with regard to the time of delivery of the shed; and erred in finding that defendant did not have a reasonable opportunity to inspect the goods. Plaintiff also contends defendant offered no competent evidence that the shed was not merchantable or that plaintiff breached a warranty of fitness for a particular purpose. With respect to damages, plaintiff contends that the trial court erred because the money defendant claims to have expended to remediate the shed is significantly less than the balance owed.

II.

We begin our analysis by acknowledging the legal principles governing this appeal, starting with the standard of review. An appellate court "review[s] the trial court's determinations, premised on the testimony of witnesses and written evidence at a bench trial, in accordance with a deferential standard." D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013). In State v. S.S., our Supreme Court explained that an appellate court is simply not as experienced nor as capable as the trial court at making credibility assessments or factual findings. 229 N.J. 360, 379-81 (2017). Thus, we should not disturb a trial court's factual findings if those findings are supported by sufficient credible evidence. Id. at 381 (citing State v. Gamble, 218 N.J. 412, 424 (2014)).

A-3137-23

In contrast, we review questions of law de novo. State v. Gandhi, 201 N.J. 161, 176 (2010). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Furthermore, when "the issue raised on appeal involves the interpretation of a contract and the application of case law to the facts of the case, we review the trial court's decision de novo." N.J. Transit Corp. v. Certain Underwriters at Lloyd's London, 461 N.J. Super. 440, 453 (App. Div. 2019), aff'd o.b., 245 N.J. 104 (2021). "Accordingly, we pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011).

Turning to substantive legal principles, we consider whether the parties' contract is covered by UCC or common law. The UCC applies to "transactions in goods." N.J.S.A. 12A:2-102. Common law applies to service contracts.

For a mixed contract including goods and services, the question of whether the UCC governs "depends upon how the contract may be accurately characterized—as one for the sale of goods . . . plus incidental services, or as one for . . . services with the [service provider] furnishing materials as well as labor." Quality Guaranteed Roofing, Inc. v. Hoffmann-La Roche, Inc., 302 N.J.

Super. 163, 166 (App. Div. 1997) (omissions in original) (alteration in original) (quoting Meyers v. Henderson Constr. Co., 147 N.J. Super. 77, 79 (Law Div. 1977)).  "The legal analysis most frequently employed when courts are faced with such mixed contracts is that Article [two] of the UCC is applicable 'if the sales aspect predominates and is inapplicable if the service aspect predominates.'"  Ibid. (quoting Custom Commc'ns Eng'g, Inc. v. E.F. Johnson Co., 269 N.J. Super. 531, 537 (App. Div. 1993)).  This is a question of fact. Ibid.

Furthermore, as a general matter, "[i]t is well-settled that 'courts enforce contracts based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'"  In re Cnty. of Atlantic, 230 N.J. 237, 254 (2017) (quotation marks omitted) (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)).  "A reviewing court must consider contractual language 'in the context of the circumstances at the time of drafting and . . . apply a rational meaning in keeping with the expressed general purpose.'"  Ibid. (omission in original) (quotation marks omitted) (quoting Sachau v. Sachau, 206 N.J. 1, 5-6 (2011)).

"'[I]f the contract into which the parties have entered is clear, then it must be enforced' as written."  Ibid. (alteration in original) (quoting Maglies v. Est.

9

of Guy, 193 N.J. 108, 143 (2007)). "Where an agreement is ambiguous, 'courts will consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation.'" Id. at 255 (quoting Cnty. of Morris v. Fauver, 153 N.J. 80, 103 (1998)).

The parol evidence rule requires integrated agreements,

> may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (a) by course of dealing or usage of trade ([N.J.S.A.] 12A:1-205) or by course of performance ([N.J.S.A.] 12A:2-208); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.
>
> [N.J.S.A. 12A:2-202 (emphasis added).]

The New Jersey Supreme Court, it bears noting, has embraced an expansive view of parol evidence, stemming from Professor Corbin's view that "[a]ntecedent and surrounding factors that throw light upon . . . [the meaning of the contract] may be proved by any kind of relevant evidence." Conway, 187 N.J. 259, 268-69 (2006) (alterations in original) (omission in original) (citing 3 Corbin on Contracts § 579 (West 1960)); see also Restatement (Second) of

10

Conts. § 214 (Am. L. Inst. 1981) ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . the meaning of the writing, whether or not integrated."). With that broad approach in mind, New Jersey courts "consider all of the relevant evidence that will assist in determining the intent and meaning of the contract[,]" which can "include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." Conway, 187 N.J. at 269 (quoting Kearny PBA Local 21 v. Town of Kearny, 81 N.J. 208, 221 (1979)).

Finally, in term of general legal principles governing contract dispute cases, we note that to establish a breach of contract claim, the plaintiff must prove: (1) "the parties entered into a contract containing certain terms," (2) "plaintiff did what the contract required [the plaintiff] to do," (3) "defendant did not do what the contract required [the defendant] to do," and (4) "defendant's breach . . . caused a loss to the plaintiff." Woytas v. Greenwood Tree Experts, Inc., 237 N.J. 501, 512 (2019) (alterations in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016)). "Each element must be proven by a preponderance of the evidence." Globe Motor, 225 N.J. at 482.

III.

We next apply these general legal principles to the matter before us. We start by holding that the trial court correctly determined that the UCC governs the contract pertaining to the building and delivery of the shed. We next address plaintiff's contention that the trial court improperly relied on parol evidence to conclude that the contract language includes bracing when it found that "[t]here weren't bifold doors. There . . . wasn't the support for the countertop, bracing."

We acknowledge that the text of the contract does not include the word "bracing." We nonetheless conclude the trial court did not impermissibly rely on parol evidence to reach its conclusion. We reiterate and stress the parol evidence rule is intended to bar contradictory statements, not statements about interpretation. See Conway, 187 N.J. at 269. Applying de novo review, we believe the trial court correctly interpreted the meaning of the phrase "counter cut out [and] frame" that described the agreed-upon customization. We concur with the trial court's conclusion the shed as delivered did not include the customized feature specified in the contract.

IV.

Nor are we persuaded by plaintiff's contention the trial court erred in finding that defendant did not accept delivery of the shed. More specifically,

12

plaintiff contends defendant inspected the shed and accepted it by signing the delivery certificate. Alternatively, plaintiff asserts defendant accepted the shed by allowing a contractor to alter the shed.

The UCC provides that acceptance of goods occurs when the buyer does one of the following:

> (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that [they] will take or retain them in spite of their non-conformity; or
>
> (b) fails to make an effective rejection (subsection (1) of 12A:2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or
>
> (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by [them].
>
> [N.J.S.A. 12A:2-606(1).]

Under the UCC framework, buyers may reject goods "within a reasonable time after their delivery and tender." N.J.S.A. 12A:2-602(1). When goods are delivered, "the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner. When the seller is required or authorized to send the goods to the buyer, the inspection may be after their arrival." N.J.S.A. 12A:2-513(1) (emphasis added).

Here, the trial court made credibility findings that are critical to the fact-sensitive legal question of whether defendant accepted the shed. While the court found that plaintiff's witness was untruthful, "inconsistent[,] and contradictory[,]" the court found defendant credible, stating:

> I found that he had the ability to know what he was talking about. I found his testimony to be reasonable. I found his demeanor on the stand to be good. I found him to be truthful, not evasive. I found him to be willing to answer questions. I found his testimony to be believable. And for the most part, I didn't find his testimony to be inconsistent or contradictory.

More specifically, the trial court found defendant to be credible when he testified that he "noticed the shed wasn't what he had ordered after he gave it a thorough inspection two days after the rain stopped." Aside from our deference to the trial court's credibility assessment, we are satisfied the court's conclusion regarding the delayed inspection process is supported by evidence in the record, including email correspondence between the parties.

Regarding the question of whether defendant notified plaintiff within a reasonable time, the trial court concluded, "[a]fter a reasonable opportunity to inspect the goods. A two[-]day torrential rainstorm. And then [defendant] went out to inspect. That's a reasonable period of time. The [c]ourt finds that the actions of . . . defendant after the delivery were reasonable."

14

We agree that defendant inspected and rejected the shed within a reasonable time, in accordance with N.J.S.A. 12A:2-602(1). Upon discovering the shed's deficiencies, defendant notified plaintiff via phone and email. In these circumstances, the fact that defendant signed a delivery certificate is not conclusive on whether he acknowledged the shed was in acceptable condition because, as the trial court found based on its witness credibility assessment, defendant had not yet inspected the shed.

But even assuming for the sake of argument that defendant had initially accepted the shed at the time of its delivery, the record supports the conclusion that any such acceptance was revoked. The governing statute provides that a buyer may revoke acceptance of the goods for nonconformity. See N.J.S.A. 12A:2-608. To revoke acceptance, a buyer must show: (1) the goods do not conform, (2) the nonconformity substantially impairs the value of the goods to the buyer, and that (3) either (a) the buyer assumed the nonconformity would be cured, or (b) the buyer did not know of the nonconformity and their acceptance was reasonably induced either by the difficulty of discovering the nonconformity before acceptance or by the seller's assurances. N.J.S.A. 12A:2-608(1). Revocation must occur "within a reasonable time after he discovers"

15

the issue.  N.J.S.A. 12A:608(2).  Further, the buyer must notify the seller of the revocation.  Ibid.

Here, the trial court determined that the goods did not conform to the contract and thus impaired its value for defendant.  Further, defendant did not learn about the nonconformity until after he had a chance to inspect the shed two days after its delivery.  As the trial court correctly found, defendant's ability to inspect the shed was hampered by plaintiff's decision to deliver the shed during a rainstorm, despite defendant's request that delivery be delayed because of the storm.

In these circumstances, we conclude the trial court did not err in determining that defendant did not accept the shed when it was delivered because he did not have a reasonable opportunity to inspect it.  Our conclusion is supported by defendant's testimony and exhibits.  We are also satisfied, based on our de novo review, that defendant conducted the inspection within a reasonable time after delivery.

V.

We likewise are unpersuaded by plaintiff's contention that the trial court "failed to use the appropriate gap filler from the UCC with regard to the time of

delivery of the shed."  Plaintiff argues that it delivered the shed within a reasonable time under N.J.S.A. 12A:1-205.

The UCC establishes a "knock-out" rule, N.J.S.A. 12A:2-207(3), which provides that if an expression of acceptance contains terms that are additional to or different from those in the offer, "the conflicting terms" in both are knocked out of the contract "and, if necessary, are replaced by suitable UCC gap-filler provisions."  JPC Merger Sub LLC v. Tricon Enter.s, Inc., 474 N.J. Super. 145, 165 (App. Div. 2022) (quoting Richardson v. Union Carbide Indus. Gases, Inc., 347 N.J. Super. 524, 532-33 (App. Div. 2002)).

The critical flaw in plaintiff's argument is that the trial court did not make a factual determination about delivery time.  Defendant testified that he ordered the shed on July 15 and mentioned to Shed World that he hoped to have it delivered by Labor Day for a party.  According to defendant, Shed World replied that it should take about two or three weeks.  Plaintiff's witness testified she does not remember speaking to defendant, but that plaintiff tells their customers that delivery takes "about three to five weeks, typically."  The shed was delivered on September 6, 2022—the day after Labor Day and about eight weeks after the order was placed.

17

However, the trial court did not make any findings about whether the Shed was delivered late. Instead, the court rested its decision in favor of defendant and against plaintiff on its finding that plaintiff breached the contract because it delivered a shed that did not conform to customization specifications in the contract. In these circumstances, the "gap filler" provision plaintiff relies on is inapposite and had no bearing on the verdict.

## VI.

We next address plaintiff's contention the trial court erred in determining that plaintiff breached the contract because "[d]efendant offered no competent evidence that the shed was not merchantable. . . [or] that [p]laintiff breached a warranty of fitness for a particular purpose." Specifically, although plaintiff agrees that the service doors block the entry door, it contends that "if one opens the outside door and then partially closes the [service] door, there is no obstruction." Further, plaintiff asserts that in any event, it owed no implied warranty of fitness for a particular purpose because "[d]efendant ordered a shed of particular specifications [and] [t]he shed was delivered to those specifications."

We disagree, for the reasons explained by the trial court. We need not address whether plaintiff breached the implied warranty of merchantability or

18

the implied warranty of fitness for a particular purpose[1] because, as the trial court correctly found, plaintiff breached the contract itself by failing to fulfill its terms. We add that the record shows that defendant sought a "pool bar with a countertop."[2] We are satisfied from our de novo review of the record that the shed as delivered does not fulfill the customization specifications in the contract.

## VII.

Finally, we address plaintiff's argument the trial court erred in allowing defendant to keep the shed without requiring any additional payment. Plaintiff

---

[1] The UCC's implied warranty of merchantability constitutes a promise that all goods a merchant sells are "fit for the ordinary purposes for which such goods are used." N.J.S.A. 12A:2-314(2)(c). The implied warranty of fitness for a particular purpose requires:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.
>
> [N.J.S.A. 12A:2-315.]

[2] The trial court found that defendant communicated his intentions for the shed to plaintiff, as "[defendant] indicated to [plaintiff] . . . that it was a tight quad. In the front part of the shed he wanted it to be a pool bar with a . . . granite countertop. The back part was to be a changing area."

maintains that according to defendant's own testimony, the costs to remedy the breach were less than the amount he owed to plaintiff.

We note that a general matter, "the UCC's remedies are to be 'liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed.'" Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 426 (1997) (quoting N.J.S.A. 12A:1-106). N.J.S.A. 12A:2-711 and -712 describe the remedies available to a buyer upon a breach of a contract governed by the UCC. Specifically, where the buyer rightfully rejects or justifiably revokes acceptance, the buyer may recover as damages "so much of the price as has been paid," N.J.S.A. 12A:2-711(1), and may also "'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller," permitting it to recover "the difference between the cost of cover and the contract price," N.J.S.A. 12A:2-712(1) and (2). Cover goods "need not be identical to contract goods," but must be "commercially useable as reasonable substitutes under the circumstances of the particular case." Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 477 (1988). "The buyer on notifying the seller of [their] intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due

under the same contract." N.J.S.A. 12A:2-717. Furthermore, as a general rule, the buyer must "prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1, 14 (2007) (quoting Lane v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div. 1987)).

In this case, the contract price for the shed was $10,662.50. Defendant paid $2,000 when he placed the order, leaving a balance of $8,662.50. The record shows that defendant then hired a contractor to fix the shed to conform with the customization specifications in the contract. Defendant testified he paid the contractor $4,105 to correct the shed.

Although the trial court unambiguously ruled that defendant may retain the shed, the court did not provide sufficient reasons for equitably forgiving any balance owed. See R. 1:7-4 (requiring trial courts to make sufficient "find[ings] [of] . . . fact[] and state [their] conclusions of law").

We reproduce the portion of the trial court's oral decision that pertains to defendant's counterclaims:

> So . . . defendant has a shed that cost him some money to make some changes. . . . [P]laintiff refused to take back the shed, even though it was offered as an option. What's the [c]ourt to do? The [c]ourt's decision

is as follows. This matter was tried before the [c]ourt on January 30[], 2024 and February 20[], 2024. The [c]ourt has placed a detailed decision on the record, which the parties are invited to listen to. For the reasons set forth in detail on the record, the [c]ourt orders as follows.

Number [one], . . . plaintiff's complaint for breach of contract is denied and dismissed. Number [two], . . . defendant's counterclaim for, A, . . . (reci[s]sion), is denied. B, for setoff is denied. C, remedial measures is denied. See below. D, violation of the New Jersey Consumer Fraud Act is denied. E, a violation of the New Jersey Home Improvement Practices Act is denied. Section F, common law fraud is denied.

Section G, the breach of contract is granted. H, damages is denied. See below. I, treble damages is denied. J, punitive damages is denied. K, statutory and/or administrative civil penalties is denied. L, attorney's fees is denied. M, litigation expenses is denied. N, costs is denied. O, such other relief as the [c]ourt deems appropriate [i]s granted. The shed will remain on the property of . . . defendant.

This matter doesn't rise to the level claimed by . . . defendant. It was bungled by . . . plaintiff. There's no need to go into the New Jersey Consumer Fraud Act, the New Jersey Home Improvement Practices Act. . . . That such other relief as the [c]ourt deems equitable and just. Again, the shed will remain on the property of . . . defendant.

We reiterate that so far as the record shows, the trial court did not make findings as to the amount expended by defendant to repair the shed to include

22

the customized features specified in the contract. Nor did the court offer any explanation for why it was not requiring defendant to pay at least a portion of the original balance. Although the trial court made a general reference to "such other relief as the [c]ourt deems equitable and just[,]" the court did not expressly state that such relief includes excusing defendant from paying all or some of the difference between the outstanding balance and the amount defendant paid to the contractor. Nor did the court offer any explanation for its tacit conclusion that such payment is not required. We therefore are constrained to remand for the trial court to make more detailed findings of fact and conclusions of law on whether defendant should be required to pay any portion of the outstanding balance.

We offer no opinion on whether defendant should be required to make any payment to plaintiff other than to note that the trial court has broad authority to grant equitable relief considering all relevant circumstances so long as the reasons for exercising its equitable authority are clearly stated. We do not retain jurisdiction.

Affirmed in part and remanded in part.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division